IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

LELAND D. KISOR                                                                                PLAINTIFF

VS.                                          CIVIL NO. 03-3069

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY ADMINISTRATION                        DEFENDANT

## MEMORANDUM OPINION

Leland Kisor (hereinafter "plaintiff"), brings this action pursuant to § 205(g) of the Social Security Act ("the Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits under Titles II and XVI of the Act.

**Background:**

The applications for DIB and SSI now before this court were filed in March 1991, alleging disability beginning April 21, 1988, due chronic bronchitis, a weak back, a neck tumor, high blood pressure, and a bad shoulder.[1] (Tr. 64-73, 93, 113). His applications were denied both initially and upon reconsideration. After a hearing, an Administrative Law Judge ("ALJ") issued a decision on August 17, 1992, denying benefits. (Tr. 9-19). The Appeals Council denied plaintiff's request for further review. Subsequently, plaintiff filed a civil action in federal district court. This court remanded plaintiff's case to the Commissioner on February 23, 1995, for the purpose of obtaining additional medical evidence. (Tr. 302-310). Specifically, the Commissioner was directed to obtain a mental assessment of plaintiff's ability to perform work-related activities from the staff at Ozark Counseling

---

[1] Plaintiff's insured status for purpose of disability insurance benefits expired on December 31, 1992.

Services, and a physical assessment of plaintiff's ability to perform work-related activities from a physician who had treated plaintiff for chronic obstructive pulmonary disease.

While plaintiff's claims were pending, he filed a second application for DIB and SSI on November 8, 1994, which were denied initially and upon reconsideration. (Tr. 314-322, 727). A hearing was held on August 4, 1995, which covered the issues pertaining to the court's remand of plaintiff's DIB and SSI applications filed in March 1991 and plaintiff's request for a hearing on his subsequent applications filed in November 1994.

On October 12, 1995, the ALJ issued a new decision denying benefits. (Tr. 256-272). However, on appeal to this court, the case was again remanded on October 29, 1997. (Tr. 651-655, 664). This time, the case was remanded for further evaluation of plaintiff's mental impairment, as well as an analysis of how plaintiff's alcohol and drug abuse issues exacerbated or contributed to his non-exertional limitations. Another administrative hearing was then conducted on May 11, 1998. (Tr. 601-650). Plaintiff was present and represented by counsel.

On November 10, 1998, the ALJ issued a written decision finding that plaintiff's condition was severe, but did not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4. (Tr. 581-589). After discrediting plaintiff's subjective allegations, the ALJ concluded that he maintained the residual functional capacity ( "RFC") to perform light work with occasional postural restrictions and environmental limitations, to include exposure to temperature extremes, chemicals, dust, fumes, and humidity. In addition, the ALJ determined that plaintiff required a simple, unskilled job involving only superficial contact with the general public. Although the ALJ determined that plaintiff would not be able to return to his past relevant work, with the assistance of

a vocational expert, he concluded that plaintiff could perform the positions of assembler, janitor, and hand packager. (Tr. 24).

The Appeals Council declined to review this decision. (Tr. 5-6). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned by consent of the parties. The plaintiff and Commissioner have filed appeal briefs, and the case is now ready for decision. (Doc. # 17, 19).

**Discussion:**

The issue before this court is whether the Commissioner's decision is supported by substantial record evidence. "We will affirm the ALJ's findings if supported by substantial evidence on the record as a whole." *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Id*. *See also Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000). "However, our review 'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision.' Nevertheless, as long as there is substantial evidence in the record to support the Commissioner's decision, we will not reverse it simply because substantial evidence exists in the record that would have supported a different outcome, *Shannon v. Chater*, 54 F.3d 484, 486 (8th Cir.1995), or 'because we would have decided the case differently.'" *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001)(citations omitted).

A five-part analysis is utilized in social security disability cases. *See e.g., Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). Applying this analysis, the ALJ must determine, sequentially, the following: 1) whether the claimant is employed; 2) whether the claimant has a severe impairment; 3) whether the impairment meets a listed impairment; 4) whether the impairment prevents the claimant

from doing past work; and 5) whether the impairment prevents the claimant from doing any other work.  *Id*.; *see also* 20 C.F.R. § 404.1520.

If the claimant fails at any step, the ALJ need not continue.  "The claimant carries the burden of establishing that [he] is unable to perform [his] past relevant work, i.e., through step four, at which time the burden shifts to the Commissioner to establish that [he] maintains the residual functional capacity to perform a significant number of jobs within the national economy."  *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001)(*citing Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000)).

Of particular concern to the undersigned is the ALJ's failure to properly consider plaintiff's mental impairments.  The record indicates that this case has previously been remanded for further consideration of plaintiff's mental impairment.  However, upon a thorough review of the medical evidence on file, it is clear that the ALJ failed to conduct this analysis as directed.  Instead, he chose to ignore the mental health evaluations, stating that they were not supported by any objective medical evidence. (Tr. 584).  As such, the ALJ concluded that plaintiff's mental impairments only limited him to unskilled work involving superficial public contact.  After reviewing the evidence, we do not agree.  The relevant evidence reveals the following.

On February 1, 1994, plaintiff underwent an evaluation for mental disorders. (Tr. 434-439). Plaintiff reported problems with high blood pressure, shortness of breath, depression, and alcoholism and drug abuse. (Tr. 434).  He was said to be pleasant and tearful, with spontaneous and well organized speech. (Tr. 435).  There was no evidence of hallucinations, delusions, or suicidal ideations. However, his mood and affect were both mildly depressed, with a poor outlook on life.  Dr. Robert Yoder estimated his I. Q. to be about eighty, and found no evidence of organic brain disease. (Tr. 437).

He then diagnosed him with alcohol abuse and dysthymic disorder, and gave him a global assessment of functioning score ("GAF") of thirty. (Tr. 438).

On March 7, 1995, Dr. Brad Williams, a non-examining, consulting psychologist, completed a mental RFC assessment of plaintiff. (Tr. 333-345). After reviewing plaintiff's medical records, he concluded that plaintiff was moderately limited in the following areas: ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without interruption; accept instructions; respond appropriately to criticism; and, set realistic goals or make plans independently of others. (Tr. 333-334).

On July 14, 1995, plaintiff was diagnosed with major depression without psychotic features. (Tr. 941). He had suicidal thoughts, but no plans. (Tr. 940). Further, plaintiff was noted to have agoraphobia, a fear of being around people. (Tr. 942).

On July 20, 1995, plaintiff was again evaluated by Dr. Yoder. (Tr. 939). Plaintiff was noted to be a severely obese man, with high blood pressure, difficulty breathing, and depression. Due to his sleeping habits, Dr. Yoder placed plaintiff on Doxepin. He again diagnosed plaintiff with major depression without psychotic features, and gave him a GAF of twenty. (Tr. 939).

On July 21, 1995, Dr. Yoder completed a mental RFC assessment of plaintiff. (Tr. 492-493). He concluded that plaintiff had a good ability to follow work rules and understand, remember, and carry out detailed, simple, and complex job instructions. However, he found plaintiff's judgment to be only fair, and determined that plaintiff's ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stresses, function independently, maintain attention/concentration, maintain personal appearance, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability were poor to none. (Tr. 492-493).

Counseling notes dated October 19, 1995, reveal that plaintiff felt very dejected over his denial of disability benefits, because he had no other means of income. (Tr. 936). As a result, plaintiff reported increased suicidal ideation. (Tr. 936).

On November 02, 1995, plaintiff was "rather withdrawn and depressed," due to the fact that he was concerned that his license would be suspended for failure to pay child support. (Tr. 935). He processed his drinking problem during this counseling session, stating that he was afraid he would begin going back to the bars if he were to get over his discomfort around others. Plaintiff also reported problems with blurry vision, but stated that he did not have the money to purchase prescription glasses. (Tr. 935).

On February 2, 1996, plaintiff was depressed over the state of events in his life. (Tr. 932). There was very little that could be done for him through counseling, due to his phobia of being around people and his lack of concentration. The doctor indicated that he would continue to offer moral support for him, and to help him process his life situation. (Tr. 932).

Progress notes dated March 19, 1996, indicate that plaintiff continued to suffer from depression. (Tr. 931). He also continued to experience agoraphobia, and lacked the ability to concentrate on or remember things. (Tr. 931).

On July 3, 1996, plaintiff had his first appointment with Dr. Lloyd Spencer, a psychiatrist. (Tr. 926). Records indicate that he looked depressed, and reported being alcohol and drug free since October 12, 1995. Plaintiff also complained of continued problems sleeping, in spite of taking Trazodone. Dr. Spender diagnosed him with full blown panic attacks, started him on Prozac and Chlorazepate. (Tr. 926).

On July 8, 1996, plaintiff reported feeling much better on Prozac. (Tr. 925). However, he continued to have problems sleeping. Therefore, Dr. Spencer increased his evening Chlorazepate dosage. (Tr. 925).

On September 24, 1996, plaintiff was reportedly not doing well, still being depressed. (Tr. 921). Due to this and his recent hospitalization with symptoms for which no physical cause was determined, Dr. Spender increased plaintiff's Trazodone dosage. (Tr. 921). On October 22, 1996, plaintiff's medication dosages were again adjusted because he reported feeling "spacey." (Tr. 920).

On October 24, 1996, Patricia Little, a counselor, completed a mental RFC assessment. (Tr. 692-693). She noted that plaintiff had poor or no ability to relate to co-workers, deal with the public; deal with work stresses; function independently; maintain attention/concentration; understand, remember, and carry out detailed, complex, and simple job instructions; behave in an emotionally stable manner; relate predictably in social situations; and, demonstrate reliability. (Tr. 692-693). Further, she indicated that he had a fair ability to interact with supervisors. Ms. Little stated that her answers were based on her assessment of plaintiff, as well as his diagnoses of depression and anxiety.

On December 5, 1996, plaintiff reported to his counselor that he would rate his depression as a nine on a scale of one to ten. (Tr. 918).

On January 16, 1997, Dr. Marion Stowers, a psychiatrist, noted that plaintiff had been off of his medications, namely Prozac, Chlorazepate, and Trazodone, because he was out of these medications and had no money to purchase refills. (Tr. 916). Further, plaintiff reported a lack of doctors in his area. Plaintiff did, however, state that he had felt more calm and had experienced an improved mood while taking the medications. Therefore, Dr. Stowers opted to place him back on his

medications, but stated that he would obtain the prescriptions through Lilly Care because plaintiff had no health insurance. (Tr. 916).

On March 4, 1997, plaintiff reported suffering from depression since childhood. (Tr. 913). He described a "rather horrifying upbringing," with a highly intelligent father who was a violent alcoholic. In fact, he indicated that his father had killed or attempted to kill a number of people over the years. Plaintiff stated that he, himself, had also suffered from alcohol abuse, indicating that he became drunk for the first time at age nineteen. (Tr. 913). As such, plaintiff was given prescriptions for Trazodone, Depakote, and Prozac from Ozark Counseling Service ("OCS"). (Tr. 690-691).

On May 1, 1997, plaintiff had his first appointment with Dr. Victor Francis. (Tr. 909). Records indicate that he complained of depression, and stated that he could not afford to buy his medications. However, he did state that he was impressed with Prozac, as it prevent his mind from racing. Plaintiff stated that he was a recovering alcoholic, but that he did not attend AA meetings because they were a joke. He also stated that he did not attend the meetings because he did not like to be around crowds. Further, plaintiff indicated that he continued to smoke, although he was now smoking only two to three packs per day. In addition, he reported suffering from sleep apnea. (Tr. 909). Dr. Francis diagnosed him with major depression, an allergy to erythromycin, tobacco abuse, possible sleep apnea, obesity, history of asthma, history of bronchitis, and COPD. (Tr. 910). As such, he prescribed Prozac, and instructed him to schedule an appointment for a psychiatric review at OCS in three months. (Tr. 910).

On May 30, 1997, progress notes from OCS indicate that plaintiff was having problems with depression/negative mood, concentration/forgetfulness, and self-esteem/self-concept. (Tr. 907). His

8

mood and affect were appropriate, his thought process was goal directed, and he was cooperative. (Tr. 907).

On August 23, 1997, Dr. Katherine Gale, a non-examining, consultative psychologist, completed a psychiatric technique review form and a mental RFC assessment. (Tr. 838-850). She diagnosed plaintiff with affective disorders, namely depressive syndrome. (Tr. 838, 841). Dr. Gale also indicated that the record was absent of evidence, at that time, to indicate that he had a substance addiction disorder. (Tr. 844). She then rated his restrictions in activities of daily living and maintaining social functioning as slight, noted that he experienced deficiencies in concentration often, and found no evidence of episodes of deterioration. (Tr. 845). Further, Dr. Gale indicated that plaintiff had moderate limitations concerning his ability to maintain attention and concentration for extended periods, complete a normal work-day and workweek without interruptions, interact appropriately with the general public, and set realistic goals or make plans independently of others. (Tr. 847-848). He was noted to have only slight limitations in all other areas. This assessment was affirmed on April 6, 1998, by Dr. Brad Williams. (Tr. 849).

On March 20, 1998, plaintiff was referred to OCS for a mental evaluation. (Tr. 831-837). Plaintiff reported problems with depression, agoraphobia, and anxiety attacks, dating back as far back as his childhood. (Tr. 831). He even admitted that he had turned to alcohol and drugs to self medicate, stating that this was how he "got along all those years." Plaintiff indicated that he had been in outpatient treatment at OCS in the past, and was currently involved in a treatment program that had begun in July 1995. As such, he was receiving medication management, and occasionally attended individual therapy. (Tr. 832). Plaintiff also stated that he experienced panic attacks of sudden onset, associated with an increased heart rate, dizziness, and shortness of breath. (Tr. 834). Further, he

9

admitted to a history of drug and alcohol abuse, stating that he had used almost every drug earlier in life. Although plaintiff reported suicidal ideations "all of the time," he denied ever making any particular plans.

Dr. Adam Brazas noted that plaintiff's speech was spontaneous, lucid, and rational. (Tr. 833). He also indicated that what plaintiff described as paranoia was actually anxiety associated with agoraphobia. Further, his estimated I.Q. was said to be between eighty and eighty-nine. (Tr. 835). Accordingly, Dr. Brazas was of the opinion that plaintiff had a serious problem with panic attacks and agoraphobia that severely limited his ability to be gainfully employed at most jobs. (Tr. 836). It appeared as though plaintiff had abdicated to these symptoms instead of actively seeking treatment to get over them. Therefore, after diagnosing plaintiff with panic disorder with agoraphobia and dysthymia, he assessed him with a global assessment of functioning score of fifty-two. (Tr. 836-837). He noted that plaintiff appeared to be honest and open in providing the information for the evaluation. (Tr. 837). Further, Dr. Brazas indicated that plaintiff's condition was not expected to improve within the next twelve months without intensive therapy and, even with therapy, his condition would be guarded. (Tr. 837).

On May 19, 1998, Dr. Robert Yoder completed a mental RFC assessment of plaintiff. He indicated that plaintiff had a poor ability to follow work rules, deal with the public, use judgment, deal with work stresses, function independently, maintain attention/concentration, maintain personal appearance, and relate predictably in social situations. (Tr. 724-725). He also concluded that plaintiff's ability to relate to co-workers; interact with supervisors; understand, remember, and carry out complex, detailed, and simple job instructions; behave in an emotionally stable manner; and, demonstrate reliability were merely fair. (Tr. 724-725).

On June 9, 1998, plaintiff underwent a second psychological evaluation with Dr. Brazas. (Tr. 953-961). He reported symptoms of depression, anxiety, feelings of worthlessness, and thoughts of suicide. (Tr. 953). Records indicate that plaintiff was cooperative and pleasant throughout the evaluation, with spontaneous and normal speech. (Tr. 955). He denied hallucinations, but reported suicidal ideations without a plan, as well as very low feelings of self-worth. Plaintiff also stated that he was experiencing panic attacks, associated with an increased heart rate, shaking, and a feeling of impending doom or death. (Tr. 956).

Again, Dr. Brazas estimated plaintiff's I. Q. to be eighty, and found no indication of any organic involvement. (Tr. 957-958). Further, plaintiff denied the use of alcohol or drugs since 1995. (Tr. 958). As such, Dr. Brazas noted that plaintiff's most significant impairment was severe agoraphobia, which caused him to avoid all contact with people. Due to this, he found that plaintiff's independence was severely impaired by his panic attacks and agoraphobia. He was of the opinion that plaintiff was not able to function independently outside of the home. Plaintiff also reported having no friends, as his illness impaired his ability and desire to get out and make friends. Accordingly, Dr. Brazas diagnosed him with panic disorder with agoraphobia and dysthymia, and gave him a GAF of forty-eight. (Tr. 959).

On the MMPI-2, plaintiff's score was suggestive of an individual who tended to be shy, introverted, and socially withdrawn. (Tr. 960). According to the profile, these type persons experienced problems with memory and concentration, and were often unable to handle their responsibilities of everyday life, sometimes requiring inpatient treatment. Although Dr. Brazas did not find plaintiff to need inpatient treatment, he did conclude that plaintiff experienced a great deal of difficulty handling his responsibilities, due to his agoraphobia and introverted lifestyle.

Dr. Brazas also completed a mental assessment of plaintiff's ability to perform work-related activities. (Tr. 962-963). He found plaintiff to have only a fair ability to follow work rules, use judgment, interact with supervisors; understand, remember, and carry out complex and detailed job instructions; and behave in an emotionally stable manner. He also concluded that plaintiff's ability to relate to co-workers, maintain attention and concentration, relate predictably in social situations, and demonstrate reliability were fair to poor or none. Plaintiff's ability to deal with the public, deal with work stresses, and function independently was also rated as poor. (Tr. 962).

In an undated letter, Dr. Lloyd Spencer indicated that plaintiff had been a client at OCS for fifteen months, and carried diagnoses of depression and panic disorder with agoraphobia. (Tr. 695). Dr. Spencer stated that plaintiff also had social phobia symptoms that did not quite meet the criteria. According to his letter, plaintiff had been on medication throughout much of his treatment. However, in spite of fairly well control, plaintiff was still symptomatic for depression and panic disorder with agoraphobia. (Tr. 695).

In light of this evidence, we believe that remand is necessary to allow the ALJ to more fully and properly evaluate plaintiff's mental impairments. *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir. 2000) (holding that the ALJ is not free to ignore medical evidence, rather must consider the whole record). The record makes clear that plaintiff was suffering from a mental impairment that did more than simply limit him to unskilled work involving no more than incidental contact with the general public. To the contrary, the medical evidence shows that plaintiff was suffering from an impairment that severely limited his ability to work around others and handle responsibility. Accordingly, this matter is remanded for the aforesaid review.

The record also reveals that plaintiff has experienced significant problems with COPD and asthma, resulting in shortness of breath. (Tr. 188, 410, 432, 447, 451, 453, 456, 676, 853, 866, 867, 893, 910, 944, 945, 967). In addition, the medical evidence shows that plaintiff was considered to be obese. (Tr. 410, 433, 447, 724-25, 853, 910, 939). Further, as discussed above, plaintiff also suffered from mental impairments that affected his ability to work. However, we are unable to say that the ALJ properly evaluated plaintiff's physical and mental impairments in combination. His opinion contains no indication of how plaintiff's obesity, in combination with his lung disorders and anxiety disorder with agoraphobia, would impact his ability to perform work-related activities. As such, we also find remand to be necessary to allow the ALJ to consider all of plaintiff's impairments in combination, before determining plaintiff's RFC. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003).

**Conclusion:**

Accordingly, we conclude that the ALJ's decision is not supported by substantial evidence and, therefore, the denial of benefits to the plaintiff should be reversed and this matter should be remanded to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

DATED this the <u>6th </u>day of December 2005.

/s/ Beverly Stites Jones
HON. BEVERLY STITES JONES
UNITED STATES MAGISTRATE JUDGE